UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THE ESTATE OF CHRISTOPHER ABBEY
and DANIELLE THOMPSON in her
capacity as the Personal Representative
of the Estate of Christopher Abbey

             Plaintiff,

             v.

DIANA HERRING, ET AL.,

             Defendants.

_____/

Case No. 20-cv-12798

U.S. District Court Judge
Gershwin A. Drain

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
CORIZON DEFENDANTS' MOTION TO DISMISS (ECF NO. 45)**

## I.  INTRODUCTION

On October 16, 2021, Plaintiff the Estate of Christopher Abbey and Danielle Thompson, in her capacity as the Personal Representative of the Estate of Christopher Abbey ("Plaintiff"), filed the instant civil rights action on behalf of Christopher Abbey, a deceased former inmate in the Michigan Department of Corrections ("MDOC").  Am. Compl., ECF No. 33.  Plaintiff brings a single claim

1

for violations of 42 U.S.C. § 1983 and the Eighth Amendment[1] against MDOC employees Diana Herring, John Purdom, Larry Chester, Paula Burbary, Dale Holcomb, Zia Kahn, Chad Wieber, and Max Abelman as well as MDOC contractors Quality Correctional Care of Michigan, P.C. ("Quality Correctional Care"), Corizon Health, Inc. ("Corizon"), Marianne McKissick, P.A., and Surjit Dinsa, M.D. *Id*.

Presently before the Court is Defendants Corizon, Quality Correctional Care, McKissick,[2] and Dinsa's (hereinafter collectively the "Corizon Defendants") Motion to Dismiss Plaintiff's Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6). ECF No. 45. The Motion is fully briefed, ECF Nos. 49, 51, and the Court held a hearing on the matter on April 5, 2022. For the following reasons, the Court will **GRANT IN PART AND DENY IN PART** the Corizon Defendants' Motion to Dismiss. Specifically, the Court will **GRANT** the Motion with respect the *Monell* claim

---

[1] While the second page of the Amended Complaint states it also seeks relief under the Fourteenth Amendment and Michigan wrongful death statute, MCL § 600.2922, ECF No. 33, PageID.205, the Amended Complaint does not actually bring counts under those laws. *See generally* ECF No. 33. Instead, the Fourteenth Amendment is not mentioned again, and MCL § 600.2922 is referenced in the prayer for relief as the standard by which damages should be calculated. *Id.* at PageID.235.

[2] Although she is listed as a defendant in the Amended Complaint, ECF No. 33, PageID.208, Summons was never issued for Marianne McKissick. Nevertheless, counsel for the Corizon Defendants filed the instant Motion to Dismiss on her behalf. When asked at the Motion hearing, counsel indicated McKissick is not contesting the lack of service and is proceeding in the action.

2

alleged against Defendants Corizon and Quality Correctional Care and **DENY** the

Motion with respect to all other claims and Defendants.

## II.   BACKGROUND

### A. Factual Background

Christopher Abbey was in the custody of the MDOC.  Am. Compl., ECF No.

33, PageID.205.  Abbey, who is diabetic, had a documented risk of suicide since at

least 2015.  *Id.* at PageID.209.  "Specifically, he had told health care providers on

multiple occasions that he had previously attempted to commit suicide by refusing

to take Insulin for his diabetes at least two or three different times." *Id*.  Failure to

take insulin can lead to diabetic ketoacidosis ("DKA"), a serious diabetic

complication in which the body produces excess blood acids.  *Id*.  Left untreated,

DKA can lead to diabetic coma and death.  *Id*.

In addition to suicidal tendecies, Abbey had issues with anxiety, depression,

self-injurious behavior, and a history of chemical dependence.  *Id*.  Based on his

admissions to staff, Abbey was labeled a moderate, intermediate, or low suicide risk

in several medical records during his incarceration.   *Id.*  at  PageID.210.

Nevertheless, he passed away in MDOC custody from DKA after failing to take his

medication for several days.  *Id.* at PageID.225.

3

1.  **Abbey's stay in the Duane Waters Hospital and Woodland Center Correctional Facility**

From May 20 to July 20, 2017, Abbey was placed in the Duane Waters Hospital ("DWH"), a medical facility in the MDOC, due to his self-injurious behavior and seizures. *Id*. While there, the staff reported he was self-inducing vomiting. *Id*. His electronic medical record ("EMR") also showed that he was taking food from other inmates in an attempt to increase his blood sugar to dangerous levels. *Id.* at PageID.211.

Three days after his discharge from the DWH, Abbey was referred to the MDOC's Inpatient Mental Health and Crisis Stabilization Program at the Woodland Center Correctional Facility ("WCC") in response to his continued self-induced vomiting. *Id.* at PageID.210. Abbey's referral information did not inform the WCC that he exhibited similar behavior during the two months he spent at the DWH. *Id.* at PageID.211. Video recordings show that, upon arrival, Abbey refused food and engaged in self-induced vomiting. *Id*. On July 24, 2017, the day after his referral to the WCC, Abbey informed Dr. Esmaeil Emami "that he wanted to die in any way possible and that he has [made] at least 'a dozen' suicide[e] attempts including a few months ago by 'refusing his insulin.'" *Id*. The next day, Abbey's case management report noted that he was not eating, self-inducing vomiting, and exhibiting poor hygiene. *Id*.

4

While records from other medical professionals indicated Abbey had attempted suicide by refusing his insulin medication, Defendant Dinsa's records only stated that he had attempted suicide by "cutting." *Id*. Defendant Dinsa's records also indicated that Abbey was self-inducing vomiting on July 26, 2017. *Id*. On July 27, 2017, Abbey's records indicate he was continuing to self-induce vomiting and would be "closely monitored." *Id.* at PageID.212. Nevertheless, Defendant Dinsa recommended Abbey be discharged from the WCC on July 28, 2017, five days after his arrival, despite noting Abbey "ha[d] not made progress toward his goal of 'No self-injurious behavior'" and being aware Abbey had requested to stay at the WCC. *Id*.

Abbey remained at the WCC for a few additional days because there were no available beds in the clinic setting. *Id*. During that time, he refused to eat or take his insulin on both August 1 and August 4, 2017. *Id.* at PageID.212-13. However, later in the day on August 4, Defendant Dinsa wrote that Abbey "had good compliance with his meds." *Id.* at PageID.213.

## 2. Abbey's Stay at the Earnest C. Brooks Correctional Facility

Abbey was cleared to return to outpatient treatment on August 8, 2017. *Id*. While at the transport bus depot, Abbey became unresponsive and had a blood sugar reading of 373. *Id*. After being taken to the ER, he was taken to the general

5

population prison, Earnest C. Brooks Correctional Facility ("LRF"). On August 11, 2017, Abbey was evaluated as a moderate suicide risk because he was self-inducing vomiting; however, this designation was lowered to intermediate risk on August 14, 2017. *Id*. Abbey's medical records from August 17, note that he had refused blood sugar checks, insulin, and medication for three days and that he appeared withdrawn, disheveled, and unkempt. *Id*. The next day, after refusing insulin again, Abbey was placed in segregation for observation. *Id.* at PageID.214.

James Boland, an MDOC mental health provider, reduced Abbey's suicide risk to intermediate on August 22, 2017. *Id*. Then, on August 26, 2017, Abbey was taken to the hospital via ambulance because he was vomiting, shaking, pale, and slow to respond and he had a high blood sugar reading earlier that day. *Id*. Abbey's post-ER medical documentation noted that his issues appeared to be related to "gagging himself, self-harm." *Id*.

On August 31, 2017, Abbey told a prison staff member he wanted to kill himself. *Id*. In response, Defendant Wieber labeled him a moderate suicide risk. *Id*. Abbey told Defendant Wieber he wanted to receive increased treatment and move to a higher-level mental health care unit within LRF, but Wieber denied the request. *Id.* at PageID.215.

6

After refusing insulin for several days, Abbey was sent to the ER on September 16, 2017 because he was unable to stand and verbalized suicidal ideation. *Id*. As part of his treatment, he was intubated and put on a ventilator. *Id*. Upon his return to LRF on September 19, 2017, Abbey told a nurse, "I'm not done yet, I didn't die" and "I'm going to keep trying." *Id*. Wieber again classified Abbey as a moderate suicide risk and indicated he would evaluate Abbey every other day. *Id.* However, Defendant Wieber did not include in his records Abbey's self-harm through his diabetes medication intake as a behavior to monitor or report. *Id.* at PageID.215-16.

Defendant Kahn, Abbey's assigned mental health care provider, evaluated Abbey for only the third time on September 19, 2017. *Id.* at PageID.216. According to his records, Defendant Kahn did not believe Abbey was suicidal and instead thought Abbey was being manipulative—although he acknowledged the purportedly manipulative conduct was creating medical emergencies. *Id*. As such, Kahn discontinued all Abbey's medication for psychotic symptomology. *Id*. Two days later, Abbey reported to health care staff that he wanted to die and was admitted to the hospital. *Id*. His records reflect "the hospital workers spoke with 'Amy Roesler' at the prison[,] who informed them that the facility 'Psych' 'refuses' to pursue i[n]patient psych treatment at another facility." *Id*. Roesler also admitted the prison

knew Abbey should have been at a facility "that provides 24/7 nursing." *Id.* at PageID.217.

### 3. Abbey's Stay at the Macomb Correctional Facility

Abbey was transferred to the Macomb Correction Facility ("MRF") on September 24, 2017. *Id.* During a chart review the next day, the health care provider wrote Abbey manipulated his medication but did not document Abbey's related mental health issues or suicidal ideation. *Id.* Similarly, his note from September 27, 2017 stated that Abbey had been hospitalized for intentional DKA and had a history of seizures. *Id.*

From September 29, 2017 to October 9, 2017, Abbey was again hospitalized for DKA. *Id.* He told his mental health provider, Defendant Ableman, on October 12, 2017 that he had most recently attempted self-harm the previous September "by refusing his diabetic medication." *Id.* Defendant Ableman designated Abbey as low risk for suicide, although he did list "med refusals" as a warning sign, and scheduled Abbey for follow up the next week. *Id.* at PageID.217-18.

A medical record dated October 16, 2017, reflected that Abbey had refused all medications since returning from the hospital on October 9, and Dr. Coleman, the acting Chief Medical Officer for Corizon insisted Abbey be brought to the health care unit. *Id.* at PageID.218. However, Defendant McKissick's records from that

8

same day do not mention that Abbey had not taken his medication in several days and instead say the appointment was ordered due to a four-day "hunger strike." *Id.* at PageID.218-19. Moreover, Defendant McKissick did not request or provide Abbey mental health care during this visit. *Id.* at PageID.219.

On October 18, 2017, Abbey was transferred to segregation for "medical observation." *Id.* Defendant McKissick's records from October 19, 2017 reflect that Abbey had been refusing insulin again and suggest that he still had not had any since returning from the hospital on October 9. *Id*. Nevertheless, Defendant Ableman again designated Abbey as low risk for suicide. *Id*.

Abbey's glucose level was not tested on October 19: Defendant Herring labeled him a "no show" because he refused to leave his cell. *Id*. Abbey's previous blood sugar reading was 350 the day before, which was an increase from 214 and 130 the preceding two days. *Id*.

At approximately 11:30 P.M. on October 19, Abbey told the evening nurse he did not feel well, and Defendant Herring picked him up from his cell in a wheelchair because he was unable to ambulate. *Id.* at PageID.220. When she arrived at around 11:45 P.M., Defendant Herring found Abbey lying on the floor of his cell, sick and/or unresponsive. *Id*. When he finally responded, Abbey requested to be sent to the hospital because he was suffering from stomach pain. *Id*. Defendant Herring

9

noted a green substance in the toilet in Abbey's cell, and a Segregation Officer informed her that Abbey had not taken insulin for at least two days and was not eating. *Id*.

Defendant Herring took Abbey's vitals in the health care unit at approximately 11:50 P.M.; his blood sugar reading was high, his heart rate was above normal, his blood pressure was low, and he had an increased respiratory rate. *Id.* at PageID.2201-21. Additionally, his mouth was "dry," his abdomen was "tender to touch," he was "moaning" and "slumped over," and he experienced "recurrent vomiting." *Id.* at PageID.221. All of these are symptoms of DKA, for which Abbey was hospitalized a little over a week prior. *Id*.

Defendant Herring told Defendant McKissick, the on-call medical provider, that Abbey's vitals were stable. *Id*. Defendant McKissick determined Abbey needed to go to the hospital but decided to have him transported via state vehicle as opposed to ambulance. *Id*.

According to the control center logs, Defendant Herring did not call the custody officers for the hospital transport on October 19. *Id*. Moreover, after she finally called, the custody officers did not arrive for a significant amount of time. *Id*. Defendant Herring did not provide medical care to Abbey during this time. *Id*. at PageID.223. She has been heard on multiple occasions saying that she will not

10

provide health care to prisoners who have convictions of the nature that Abbey had. *Id*.

Defendant Purdom, a supervisory official and sergeant at the MRF, arrived at the health care unit. *Id*. He did not call an ambulance or direct his subordinates to call an ambulance. *Id*. Instead, he went to the control center and instructed Defendants Chester and Burbary to wait to take Abbey to the hospital until after the inmate count finished. *Id*. When Defendants Purdom and Chester returned to the health care unit 45 minutes later, Abbey was unresponsive or barely responsive. *Id*. at PageID.224. Moreover, even though Abbey had been transported to the health care unit in a wheelchair, Defendants Purdom and Chester did not initially arrange for a car with wheelchair capacity to transport Abbey to the hospital, further delaying his transport. *Id*. Abbey was finally taken to the hospital at approximately 1:15 A.M. on October 20, 2017. *Id*. At this point, he was slumped over in his wheelchair but still breathing. *Id*.

Due to the discrepancy between the average travel time between the MRF and the hospital and the amount of time it took them to arrive that night, Plaintiff alleges Defendants Chester and Burbary intentionally took a slower route to get Abbey to the hospital. *Id.* at PageID.225. Abbey arrived at the hospital ashen, gray, and without a pulse, and his skin was cold, pale, and cyanotic. *Id*. Medical professionals

11

attempted CPR and two doses of Epinephrine. *Id.* Despite their efforts, Abbey was pronounced dead at 2:17 A.M. According to an autopsy, he died from DKA; his blood sugar level was over 600. *Id.*

Plaintiff further alleges Defendant Holcomb did not properly handle the investigation into Abbey's death. *Id.* at PageID.226

## B. Procedural Background

Plaintiff brings two claims within Count I. First, Plaintiff alleges each of the Defendants violated the Eight Amendment's proscription against cruel and unusual punishment by:

> (a) failing to adequately screen and classify [Abbey]; (b) failing to evaluate adequately [Abbey]'s suicidal intent; (c) failing to provide appropriate pharmacotherapy in response to suicidal ideations and attempts; (d) failing to provide adequate monitoring in the prison setting; (e) failing to gather an adequate history; (f) failing to properly evaluate [Abbey]'s need for psychopharmacological intervention or provide suitable pharmacotherapy; (g) failing to implement hospitalization or heightened levels of treatment in response to suicidal attempts and ideation; (h) discharging [Abbey] from i[n]patient treatment program despite evidence that he had not improved or stopped engaging in self-harm; (i) disregarding [Abbey]'s pleas for increased level of mental health treatment; (j) failing to manage and coordinate [Abbey]'s treatment needs between both mental health providers and non-mental health medical providers; (k) failing to adequately conduct mental status examinations; (l) failing to diagnose [Abbey]'s symptoms; (m) failing to establish an adequate formal treatment plan; (n) failing to safeguard the outpatient environment by

12

failing to monitor medication intake and self-induced vomiting; (o) failing to adequately document clinic judgments, rationale, and observations impeding proper future care; (p) failing to do a proper assessment of [Abbey]'s vital signs; (q) failing to accurately document vital signs in the medical record; (r) intentionally failing to communicate [Abbey]'s true vital signs to the supervising medical provider; (s) disregarding [Abbey]'s non-responsive state and urgent need for medical treatment; (t) failing to call an ambulance when [Abbey] was unresponsive; (u) delaying [Abbey]'s transportation to the hospital; (v) delaying over an hour before sending [Abbey] to the hospital; (w) delaying urgently needed medical treatment in response to nonmedical issues; (x) delaying the drive to the hospital by taking a longer route; (y) failing to request a car that can fit a wheelchair when [Abbey] was nonresponsive and in a wheelchair in healthcare; (z) disregarding subordinates' failures to provide adequate care and treatment causing [Abbey]'s death; (aa) failing to refrain from intentionally denying or delaying access to appropriate medical care; and (bb) acting with deliberate indifference towards [Abbey] and his repeated attempts to take his life and/or commit self-harm.

Am. Compl., ECF No. 33, PageID.227-29.

Second, Plaintiff brings a *Monell* liability claim against Defendants Corizon and/or Quality Correctional Care for failure to train and supervise or, in the alternative, an unconstitutional policy, custom, and/or practice. *Id.* at PageID.229. Specifically, Plaintiff asserts, "Defendant Corizon has policies, practices, or customs that demonstrate and foster deliberate indifference to the medical treatment of prisoners." *Id.* at PageID.231. Additionally, Plaintiff avers, "Defendant Corizon failed to train and supervise its physician-employees on the need to provide adequate

13

mental health care to inmates engaged in self-harm," or "[i]n the alternative, Defendant Corizon has an affirmative policy to provide substandard mental health care to inmates." *Id*. Further, Plaintiff contends Corizon's failure to train or supervise its employees to provide proper healthcare amounted to deliberate indifference. *Id*.

As stated *supra*, the Corizon Defendants have moved to dismiss Plaintiff's Amended Complaint for failure to state a claim upon which relief may be granted. ECF No. 45. First, the Corizon Defendants construe Plaintiff's claim against Defendant Dinsa as one for wrongful death, *id*. at PageID.286, and argue it must be dismissed because Dinsa's actions were neither the cause in fact nor proximate cause of Abbey's death, which occurred seventy-seven days after Dinsa's last interaction with him. *Id*. at PageID.282. Second, the Corizon Defendants contend Plaintiff cannot make out a deliberate indifference claim against Defendant McKissick because Plaintiff acknowledges Defendant Herring did not tell McKissick that Abbey's vitals were unstable, and McKissick made the decision to transport Abbey to the hospital via state vehicle on that basis. *Id*. at PageID.289. Third, the Corizon Defendants aver Plaintiff's allegations against Defendants Dinsa and McKissick amount to a dispute over the adequacy of treatment as opposed to a demonstration of deliberate indifference. *Id*. at PageID.291-92. Finally, the Corizon Defendants

14

assert Plaintiff has not properly alleged a *Monell* claim against Quality Correctional Care or Corizon. *Id.* at PageID.293. Specifically, they emphasize that the Amended Complaint does not make any allegations of wrongdoing against Quality Correctional Care. *Id.* Additionally, they argue Plaintiff has "not specified an unconstitutional policy or policy of inadequate training, nor linked that policy to any specific injury suffered by Plaintiff's decedent." *Id.*

Plaintiff filed a timely Response. ECF No. 49. First, Plaintiff counters that Defendant Dinsa's proximate cause argument is misplaced, as it is not necessary to establish proximate cause in deliberate indifference analysis. *Id.* at PageID.373-74 (citing *Cooper v. Cty. of Washtenaw*, 222 F. Appx. 459, 471 (6th Cir. 2007); *Clark-Murphy v. Foreback*, 439 F.3d 280, 292-293 (6th Cir. 2006)). Further, Plaintiff contends the allegations against Defendant Dinsa constitute more than a dispute over medical judgment where he, *inter alia*, recommended Abbey's discharge from the WCC mental health facility despite knowledge that Abbey still needed and wanted treatment. *Id.* at PageID.377. Second, Plaintiff avers Defendant McKissick has mischaracterized the allegations against her by ignoring an alternative pleading. *Id.* at PageID.378. Additionally, like with Defendant Dinsa, Plaintiff argues the allegations against Defendant McKissick demonstrate more than a dispute over

15

medical judgment because she failed to request or provide mental health care for Abbey both times she saw him prior to his death.  *Id.* at PageID.380.

Finally, Plaintiff avers it has alleged an unlawful practice or custom claim against Defendant Corizon.  *Id.* at PageID.381.  Specifically, Plaintiff claims, "Defendant Corizon had an affirmative policy to provide substandard mental health care to prisoners or, in the alternative, a gross failure to train and supervise its employees." *Id.* at PageID.382.  This was not one instance of misconduct, Plaintiff argues, because "the [Amended] [C]omplaint clearly alleges that multiple physicians and mental health providers, under direction of Corizon and pursuant to this policy, affirmatively refused and failed to provide [Abbey] with urgently needed psychiatric and mental health treatment for his express suicidal attempts and ideation over a period of several months." *Id.*  Further, Plaintiff asserts, "'evidence of a single violation of federal rights, accompanied by a showing that the [entity] had failed to train its employees to handle recurring situations presenting an obvious potential for such a violation' is sufficient." *Id.* at PageID.382-83 (quoting *Jackson v. City of Cleveland*, 925 F.3d 793, 836 (6th Cir. 2019)).

The Corizon Defendants filed a timely Reply.  ECF No. 51.  They reassert that (1) Plaintiff alleges a claim under the wrongful death act and thus must establish proximate cause, *id.* at PageID.388-90; (2) the allegations against Defendants Dinsa

16

and McKissick amount to an improper dispute of medical judgment, *id.* at PageID.391-93; and (3) Plaintiff has failed to properly state any *Monell* claim, *id.* at PageID.393-94.

### III.   LAW & ANALYSIS

#### A. Legal Standard

Federal Rule of Civil Procedure 12(b)(6) allows a district court to assess whether a plaintiff has stated a claim upon which relief may be granted.   To withstand a motion to dismiss pursuant to Rule 12(b)(6), a complaint must comply with the pleading requirements of Federal Rule of Civil Procedure 8(a)(2).   *See Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009).   Rule 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."   *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks omitted) (quoting Fed. R. Civ. P. 8(a)(2); *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).   To meet this standard, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."   *Twombly*, 550 U.S. at 570; *see also Iqbal*, 556 U.S. at 678–80 (applying the plausibility standard articulated in *Twombly*).

17

When considering a Rule 12(b)(6) motion to dismiss, the court must construe the complaint in the light most favorable to the plaintiff and accept all his or her factual allegations as true. *Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008). While a court is required to accept the *factual allegations* in a complaint as true, *Twombly,* 550 U.S. at 555, the presumption of truth does not apply to a claimant's *legal conclusions*. *Iqbal,* 556 U.S. at 678. Therefore, to survive a motion to dismiss, the plaintiff's pleading for relief must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Ass'n of Cleveland Fire Fighters v. City of Cleveland,* 502 F.3d 545, 548 (6th Cir. 2007) (quoting *Twombly,* 550 U.S. at 555) (internal citations and quotation marks omitted).

## B. Discussion

An official violates the Eighth Amendment where he or she acts with "deliberate indifference to an inmate's serious medical needs." *Brawner v. Scott Cnty., Tennessee*, 14 F.4th 585, 591 (6th Cir. 2021). For an inmate to show that prison officials violated the Eighth Amendment by denying medical care, the inmate must show (1) that he or she was deprived of an objectively serious medical need, and (2) that the defendant knew "of and disregard[ed] an excessive risk to [his or her] health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Rhinehart v. Scutt*, 894 F.3d 721, 737–38 (6th Cir. 2018). A serious medical need is "one that

18

has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008).  "It is well-established in this Circuit that suicidal tendencies are considered 'serious medical needs' for the purposes of this analysis."  *Cooper v. Cty. of Washtenaw*, 222 F. App'x 459, 465 (6th Cir. 2007).

The second, or subjective, prong requires the plaintiff to demonstrate "a high standard of culpability, 'equivalent to criminal recklessness.'" *Greene v. Crawford Cty.*, Michigan, 22 F.4th 593, 605 (6th Cir. 2022) (quoting *Griffith v. Franklin Cnty., Kentucky*, 975 F.3d 554, 568 (6th Cir. 2020)).  "This showing requires proof that each defendant 'subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk' by failing to take reasonable measures to abate it."  *Rhinehart*, 894 F.3d at 738 (quoting *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001)).

### 1. Plaintiff has sufficiently plead Defendant Dinsa's involvement in the alleged constitutional violations.

The Corizon Defendants base their causation argument on Michigan's wrongful death statute, MICH. COMP. LAWS § 600.2922(1).  ECF No. 45, PageID.286 ("Plaintiff's claim against all Defendants, and particularly Dr. Dinsa, is that of a wrongful death claim pursuant to Mich. Comp. Laws § 600.2922(1) . . . .").

19

Specifically, they argue that even if Defendant Dinsa's alleged actions constituted deliberate indifference, they were "too remote in time" to have caused Abbey's death.   ECF No. 51, PageID.389 (emphasis omitted); *see also* ECF No. 45, PageID.287.

Notably, Plaintiff does not bring any claims under the wrongful death statute. As stated in footnote 1 *supra*, the only actual reference to the wrongful death statute in the Amended Complaint is a request for damages to be calculated pursuant to that law.  Am. Compl., ECF No. 33, PageID.235.  Indeed, "under Michigan precedent it is clear that a wrongful death action is derivative, rather than independent, of a decedent's underlying tort action." *Kane v. Rohrbacher*, 83 F.3d 804, 805 (6th Cir. 1996).  Here, Plaintiff has chosen to pursue an Eighth Amendment claim under 42 U.S.C. § 1983, and it is not for the Defendants to alter the Plaintiff's pleadings to suit their defense.

Nevertheless, Defendants are correct that Plaintiff must establish a causal link between Defendant Dinsa's actions and the unconstitutional injury to properly plead the claim.  The Sixth Circuit Court of Appeals has noted that "[t]wo traditional tort principles show that a § 1983 plaintiff generally must prove both that a defendant was *personally* at fault and that the defendant's culpable conduct (not somebody else's) *caused* the injury." *Pineda v. Hamilton Cty.*, *Ohio*, 977 F.3d 483, 490 (6th

20

Cir. 2020) (emphases in original).  As to the first prong, when bringing a § 1983

claim, "a plaintiff must plead that each Government-official defendant, through the

official's own individual actions, has violated the Constitution."  *Id.* (quoting

*Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)).  As to the second prong, "the Supreme

Court has long required proof of a causal connection between the defendant's

unconstitutional action and the plaintiff's injury."  *Id.*; *see also Rudd v. City of

Norton Shores, Michigan*, 977 F.3d 503, 512 (6th Cir. 2020) (holding a § 1983

plaintiff "cannot generically hold one defendant liable for another's actions.  Rather,

he must allege that each defendant, through that defendant's own actions,

'subject[ed]' him (or 'cause[d]' him to be subjected) to the constitutional

deprivation.") (citing *Jane Doe v. Jackson Local Sch. Dist. Bd. of Educ.*, 954 F.3d

925, 934 (6th Cir. 2020)) (alterations in original).

Here, it is clear Plaintiff has both alleged Defendant Dinsa was personally at

fault and that his conduct caused some of Abbey's alleged injuries.  *See Pineda*, 977

F.3d at 490.  Specifically, Plaintiff has asserted the following actions, which were

taken by Defendant Dinsa as well as others, violated Abbey's constitutional rights:

> (a) failing to adequately screen and classify [Abbey]; (b) failing to
> evaluate adequately [Abbey]'s suicidal intent; (c) failing to provide
> appropriate pharmacotherapy in response to suicidal ideations and
> attempts; . . . (e) failing to gather an adequate history; (f) failing to
> properly evaluate [Abbey]'s need for psychopharmacological

21

intervention or provide suitable pharmacotherapy; (g) failing to implement hospitalization or heightened levels of treatment in response to suicidal attempts and ideation; (h) discharging [Abbey] from i[n]patient treatment program despite evidence that he had not improved or stopped engaging in self-harm; (i) disregarding [Abbey]'s pleas for increased level of mental health treatment; . . . (l) failing to diagnose [Abbey]'s symptoms; . . . [and] (o) failing to adequately document clinic judgments, rationale, and observations impeding proper future care; . . . .

Am. Compl., ECF No. 33, PageID.227-28.

The deprivation of needed medical care can constitute, in and of itself, an Eighth Amendment violation, even if it does not result in death. *See Estelle v. Gamble*, 429 U.S. 97, 103 (1976) ("The government has an "obligation to provide medical care for those whom it is punishing by incarceration."); *Grose v. Caruso*, 284 F. App'x 279, 284 (6th Cir. 2008) ("[I]t is well-settled that lack of proper medical treatment can constitute an Eighth Amendment violation."); *see also Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 899 (6th Cir. 2004) ("As the Supreme Court has held, the test for deliberate indifference is whether there exists a *substantial risk* of serious harm, and does not require actual harm to be suffered.") (citation and internal quotation marks omitted) (emphasis in original).

Indeed, Plaintiff asserts that Abbey's unconstitutional injury was the violation of his right "to receive proper and adequate medical care while incarcerated

22

and under the custody of the Michigan Department of Corrections," *id.* at PageID.227, not just his death. That Abbey was allegedly subjected to deliberate indifference to his serious medical needs for a protracted period should not shield Defendant Dinsa from potential liability. Thus, the Motion to Dismiss cannot be granted as to Defendant Dinsa on the basis.

### 2. Plaintiff has sufficiently plead Defendant McKissick's involvement in the alleged constitutional violations.

The Corizon Defendants assert Plaintiff cannot demonstrate Defendant McKissick had the necessary state of mind to establish a deliberate indifference claim against her because Defendant Herring did not inform her that Abbey's vitals were unstable. ECF No. 45, PageID.289 (citing Am. Compl., ECF No. 33, PageID.33). However, the Court agrees with Plaintiff that the Corizon Defendants have disregarded Plaintiff's alternate allegation that Defendant McKissick, a licensed physician's assistant, knew of Abbey's serious condition and still failed to order him taken to the hospital via ambulance. ECF No. 49, PageID.378-79.

Notably, the Corizon Defendants did not respond to this argument in their Reply and have effectively conceded this issue. *Cf. Degolia v. Kenton Cty.*, 381 F. Supp. 3d 740, 759–60 (E.D. Ky. 2019) ("[I]t is well understood . . . that when a [party] files an opposition to a dispositive motion and addresses only certain arguments raised by the [movant], a court may treat those arguments that the [party]

23

failed to address as conceded.") (quoting *Rouse v. Caruso*, No. 6-cv-10961-DT, 2011 WL 918327, at *18 (E.D. Mich. Feb. 18, 2011)) (internal quotation marks omitted); *Humphrey v. U.S. Attorney General's Office*, 279 F. App'x 328, 331 (6th Cir. 2008) (recognizing that a party's lack of response to a motion or argument therein is grounds for the district court to grant the motion).

Even if the Corizon Defendants had responded, parties are entitled to plead in the alternative. Fed. R. Civ. P. 8(d)(2) ("If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient."). According to the Amended Complaint, on the night Abbey died, Defendant McKissick was aware he had recently suffered from DKA and had not taken insulin in ten days. Am. Compl., ECF No. 33, PageID.219. Moreover, he was seemingly in and out of consciousness that entire night until he arrived at the hospital. *Id.* at PageID.220-25; *see also id.* at PageID.226. Nevertheless, despite her medical training and after assessing Abbey at the behest of Defendant Herring, Defendant McKissick determined not to utilize emergency transport to get Abbey to the hospital. *Id.* at PageID.221.

Additionally, on October 16, a few days before Abbey's death, after the acting Chief Medical Officer insisted Abbey be transported to the health care unit for refusing insulin for seven days, Defendant McKissick's notes did not reflect that Abbey had been without medication and instead attributed the visit to a hunger

24

strike. *Id.* at PageID.218-19.  Moreover, she did not request or provide mental health care at this time or when she saw him again earlier on October 19 and noted that he was still refusing insulin.  *Id.* at PageID.219.

Thus, the Court finds Plaintiff has sufficiently alleged Defendant McKissick "subjectively perceived facts from which to infer substantial risk to the prisoner, that [s]he did in fact draw the inference, and that [s]he then disregarded that risk by failing to take reasonable measures to abate it." *Rhinehart*, 894 F.3d at 738 (quoting *Comstock*, 273 F.3d at 703).  Accordingly, the claims against her cannot be dismissed on this basis.

### 3. Plaintiff has sufficiently plead the Objective Component of an Eighth Amendment Claim.

As stated *supra*, the Corizon Defendants aver Plaintiff's allegations against Defendants Dinsa and McKissick amount to a dispute over medical judgement or the adequacy of Abbey's care and thus cannot constitute deliberate indifference. ECF No. 45, PageID.291.

However, to the extent the Corizon Defendants argue inmates can never dispute the adequacy of their treatment, they misstate the current law.  In doing so, they seem to collapse the objective and subjective components of an Eighth Amendment claim.  As stated *supra*, for an inmate to show that prison officials violated the Eighth Amendment by denying medical care, the inmate must show (1)

25

that he or she was deprived of an objectively serious medical need, and (2) that the defendant knew "of and disregard[ed] an excessive risk to [his or her] health or safety." *Farmer*, 511 U.S. at 837; *Rhinehart*, 894 F.3d at 737–38.  Suicidal tendencies are considered "serious medical needs" within the Sixth Circuit. *Cooper*, 222 F. App'x at 465.  Thus, "[a] plaintiff meets the objective prong of the Eighth Amendment analysis by showing that the inmate showed suicidal tendencies during the period of detention or that he posed a strong likelihood of another suicide attempt." *Troutman v. Louisville Metro Dep't of Corr.*, 979 F.3d 472, 482–83 (6th Cir. 2020) (internal quotation marks omitted).

Even if suicidal tendencies were not a special case, a "plaintiff can establish the objective component by showing that the prison failed to provide treatment or that it provided treatment so cursory as to amount to no treatment at all." *Rhinehart*, 894 F.3d at 737 (citations and internal quotation marks omitted).  Alternatively, a prisoner who "has received on-going medical treatment and claims that this treatment was inadequate" must show that the treatment he or she received was so incompetent or inadequate "as to shock the conscience or to be intolerable to fundamental fairness." *Id.* (internal quotation marks omitted) (quoting *Miller v. Calhoun Cty.*, 408 F.3d 803, 819 (6th Cir. 2005)).

26

Here Plaintiff alleges Defendant Dinsa knew (1) Abbey was engaged in self-harm, including by manipulating his diabetic medication in order to cause DKA, (2) suffered from suicidal tendencies, and (3) requested to remain at the mental health facility at the WCC.  Am. Compl., ECF No. 33, PageID.211-12.  Further, despite noting that Abbey "had not made progress toward his goal of 'No self-injurious behavior,'" Defendant Dinsa recommended Abbey be discharged after only five days.  *Id.* at PageID.212.  He also wrote in his notes that Abbey had "good compliance with meds" even though Abbey had refused his insulin several times during his stay at the WCC, including earlier on the day Dinsa wrote that note.  *Id.* at PageID.213.  Plaintiff has thus asserted Defendant Dinsa stopped Abbey's stay in the MDOC's Inpatient Mental Health and Crisis Stabilization Program despite explicit knowledge that Abbey was still suffering from the issues that led to his initial referral.

In this context, Plaintiff has alleged that Defendant Dinsa's treatment was "so cursory as to amount to no treatment at all." *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 551 (6th Cir. 2009) (affirming denial of summary judgment on deliberate indifference claim and finding it "troubling" that defendant, a registered nurse, who was informed decedent was suffering from heat exhaustion, sent him back to his cell despite the severity of his symptoms).  Accordingly, Plaintiff has established the

27

objective component of an Eighth Amendment claim against Defendant Dinsa. *See Troutman*, 979 F.3d 472, 482 (6th Cir. 2020) ("Inmates do not have a guaranteed Eighth Amendment right to be screened correctly for suicidal tendencies, however, prison officials who have been alerted to a prisoner's serious medical needs are under an obligation to offer medical care to such a prisoner.") (internal quotation marks omitted). Plaintiff has also, based on these facts, alleged Defendant Dinsa "subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk by failing to take reasonable measures to abate it" and thus established the subjective component of an Eighth Amendment claim as well. *Rhinehart*, 894 F.3d at 738 (quoting *Comstock*, 273 F.3d at 703).

As to Defendant McKissick, again Plaintiff meets the objective component of an Eighth Amendment violation because no one disputes Abbey's suicidal tendencies. *See Troutman*, 979 F.3d at 482–83. Additionally, the Sixth Circuit has found that delayed medical treatment in the face of serious medical conditions can constitute deliberate indifference. *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 551 (6th Cir. 2009) ("While there was nothing inappropriate about Fletcher's initial treatment instructions, Fletcher's care demonstrates deliberate indifference when she informed Dominguez that despite his serious symptoms she would not see him until

28

her regularly scheduled medication run at around 7:00 p.m."); *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 845 (6th Cir. 2002) ("[A]lthough she knew about the decedent's serious medical condition, Dr. Lee chose to wait [almost an hour] for Dr. Said instead of immediately contacting another physician or the emergency team.  Dr. Lee's delayed action also cost the decedent invaluable time, during which he could have received medical care which may have saved his life."). As discussed *supra*, Plaintiff has alleged Defendant McKissick was aware of Abbey's "serious condition" and still did not order him to be taken to the hospital via emergency services.  Accordingly, Plaintiff has adequately asserted an Eighth Amendment claim against Defendant McKissick.

### 4.  Plaintiff has failed to adequately plead a *Monell* violation.

Lastly, the Corizon Defendants aver Plaintiff has failed to properly plead a *Monell* claim against Corizon or Quality Correctional Care.  ECF No. 45, PageID.293.

As a threshold matter, the Corizon Defendants contend the cause of action must be dismissed as to Quality Correctional Care because the "Amended Complaint makes no allegations of wrongdoing" against it "whatsoever."  *Id*.  Plaintiff "admits that the complaint does not allege specific wrongdoing" but argues Quality Correctional Care should not be dismissed as a defendant because it is "alleged to

29

be the Michigan entity upon which Corizon technically and legally operates and is thus necessary for liability purposes." ECF No. 49, PageID.352. Nevertheless, as stated *supra*, Federal Rule of Civil Procedure 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks omitted) (quoting Fed. R. Civ. P. 8(a)(2); *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Moreover, "a § 1983 plaintiff generally must prove both that a defendant was *personally* at fault and that the defendant's culpable conduct (not somebody else's) *caused* the injury." *Pineda*, 977 F.3d at 490 (emphases in original). Plaintiff has not given Quality Correctional Care notice of the allegations against it, let alone alleged that it was personally involved in Abbey's constitutional violations. Accordingly, the *Monell* claim against Quality Correctional Care must be dismissed.

"'Like a municipality, a government contractor cannot be held liable on a *respondeat superior* theory,' but rather 'for a policy or custom *of that private contractor*.'" *Winkler v. Madison Cty.*, 893 F.3d 877, 904 (6th Cir. 2018) (quoting *Johnson v. Karnes*, 398 F.3d 868, 877 (6th Cir. 2005)) (emphasis in original). This is because a contractor should not be held liable under § 1983 "*solely* because it employs a tortfeasor." *D'Ambrosio v. Marino*, 747 F.3d 378, 388–89 (6th Cir. 2014)

30

(quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)).   Instead, a plaintiff must show that "through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." *Alman v. Reed*, 703 F.3d 887, 903 (6th Cir. 2013) (quoting *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997)); *see also St. v. Corr. Corp. of Am.*, 102 F.3d 810, 817-18 (6th Cir. 1996) (holding government contractor could only be subject to liability if official's deliberate indifference to the risk of harm to the plaintiff was undertaken pursuant to a policy or custom of the contractor or because of the inadequacy of the official's training). To show the existence of a municipal policy or custom leading to the alleged violation, a plaintiff can identify: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (citation omitted).

As stated *supra*, Plaintiff argues "Defendant Corizon had an affirmative policy to provide substandard mental health care to prisoners or, in the alternative, a gross failure to train and supervise its employees."   ECF No. 49, PageID.382. Plaintiff further contends this policy is demonstrated by the fact that "multiple

31

physicians and mental health providers, under direction of Corizon and pursuant to this policy, affirmatively refused and failed to provide Christopher with urgently needed psychiatric and mental health treatment for his express suicidal attempts and ideation over a period of several months." *Id.*

"[T]o satisfy the *Monell* requirements a plaintiff must 'identify the policy, connect the policy to the [defendant] itself and show that the particular injury was incurred because of the execution of that policy.'" *Jackson*, 925 F.3d at 829 (quoting *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993)). When proceeding under the official policy theory of *Monell* liability, "the plaintiff must show that there were 'formal rules or understandings—*often but not always committed to writing*—that [were] intended to, and [did], establish fixed plans of action to be followed under similar circumstances consistently and over time.'" *Id.* (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81 (1986) (emphasis added)).

However, here, neither the Amended Complaint nor Plaintiff's Response identify the specific policy that resulted in the substandard health care to which Abbey was subjected. Instead, Plaintiff relies on a quote from *Jackson* opinion: "evidence of a single violation of federal rights, accompanied by a showing that the City had failed to train its employees to handle recurring situations presenting an

32

obvious potential for such a violation."  925 F.3d at 836 (quoting *Campbell v. City of Springboro*, 700 F.3d 779, 794 (6th Cir. 2012)).  However, this quote is irrelevant to the official policy theory; it is part of the standard for the third option for *Monell* liability—inadequate training or supervision—which Plaintiff cannot demonstrate for the reasons discussed *infra*.  Notably, in *Jackson*, in contrast to the Plaintiff here, the plaintiffs argued that a *formal*, *written* policy promulgated by the municipal defendant authorized *Brady* violations, *id.* at 829, and the Sixth Circuit agreed, *id.* at 831.  "As a result, [Plaintiff's] conclusory allegation that [Corizon's] policies caused the violation of his constitutional right does not state a claim to relief that is plausible on its face."  *Maxwell v. Corr. Med. Servs., Inc.*, 538 F. App'x 682, 692 (6th Cir. 2013) (citation and internal quotation marks omitted).

To establish *Monell* liability for failure to train, "a plaintiff 'must establish that: 1) the City's training program was inadequate for the tasks that officers must perform; 2) the inadequacy was the result of the City's deliberate indifference; and 3) the inadequacy was closely related to or actually caused the injury.'"  *Jackson*, 925 F.3d at 834 (quoting *Ciminillo v. Streicher*, 434 F.3d 461, 469 (6th Cir. 2006).  Here, Plaintiff fails on the first prong.  Plaintiff broadly states, "Defendant Corizon failed to train and supervise its physician-employees on the need to provide adequate mental health care to inmates engaged in self-harm."  Am. Compl., ECF No. 33,

33

PageID.231. However, Plaintiff makes no particular allegations regarding the training Corizon provides for mental health treatment other than it must be inadequate given the care Abbey received. *See genuinely* Am. Compl., ECF No. 33, PageID.230-33. *Cf. Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006) (to establish a claim for failure to train or supervise, the plaintiff must "*show* a policy of inadequate training or supervision") (emphasis added). Thus, the Court has no way to know whether the Defendants' alleged "shortcomings may have resulted from factors other than a faulty training program." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390–91 (1989).

In contrast, in *Jackson*, on which Plaintiff relies, the plaintiffs demonstrated that the defendant city trained its police officers using a manual which "could be read as insufficient to inform officers of their disclosure obligations." *Jackson*, 925 F.3d at 835. For this and other reasons, the Sixth concluded the plaintiffs had presented sufficient evidence that there was a genuine issue of material fact as to whether officers were inadequately trained on their disclosure obligations. *Id.* at 836. While Plaintiff is not, at this stage, required to provide evidence of the training program at issue, Plaintiff must still satisfy the pleading requirements of Rule 8(a)(2). Because Plaintiff has not, Plaintiff cannot establish *Monell* liability for failure to train.

34

As Plaintiff has not sufficiently plead either *Monell* theory, the claim must be dismissed.

### IV.   CONCLUSION

Accordingly, for the reasons articulated above, the Court will **GRANT IN PART AND DENY IN PART** the Corizon Defendants' Motion to Dismiss (ECF No. 45).  Specifically, the Court will **GRANT** the Motion with respect the *Monell* claim alleged against Defendants Corizon and Quality Correctional Care and **DENY** the Motion with respect to all other claims and Defendants.

**IT IS SO ORDERED**.

> s/Gershwin A. Drain
> GERSHWIN A. DRAIN
> UNITED STATES DISTRICT JUDGE

Dated:  April 12, 2022

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
April 12, 2022, by electronic and/or ordinary mail.
/s/ Teresa McGovern
Case Manager

35